**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | No. 07-CR-76-TCK |
| ) | |
| CHRISTOPHER ADAM DAYTON, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Defendant is charged with one count of distribution of visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2), and one count of possession of visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(4)(B). Before the Court is Defendant's Motion to Suppress ("Motion") (Doc. 45), wherein Defendant seeks to suppress statements by Defendant on grounds that they were obtained in violation of his Fifth Amendment rights. On April 8, 2008, the Court conducted an evidentiary hearing on the Motion. The United States presented the testimony of FBI agent Joseph Cecchini ("Cecchini"), and Defendant presented the testimony of Defendant's mother, Brenda Brantley ("Brantley").

**I.    Factual Background**

Defendant, a twenty-seven year old male, has a severe case of Crohn's disease, which resulted in removal of Defendant's large bowel and rectum at the age of two. Defendant's mother assists with his daily care. Defendant has never attended public school or been employed, and Defendant has been determined one-hundred percent disabled by the Social Security Administration. Defendant is on numerous medications but is not mentally disabled.

1

On or around March 2007, Cecchini entered the search term "8 yo girl" on an Internet site known as Limewire. Limewire located files containing visual depictions of children engaged in sexually explicit conduct, and Cecchini was able to determine that such files came from a particular Internet Protocol ("IP") address. Cecchini then served a subpoena on the Internet service provider for the IP address, which was Cox Communications ("Cox"). Cox traced the IP address to the address of 11359 E. 3rd Street, in Tulsa, Oklahoma. Based on this information, Cecchini obtained a search warrant for this residence.

At 8:00 a.m. on April 18, 2007, officers executed the search warrant. Cecchini testified that six or seven officers executed the search warrant, although Brantley testified that it seemed like at least twelve to fifteen officers were present. The officers were wearing ballistic vests containing the FBI logo. Three officers stationed themselves at the front door, and they knocked and announced their presence. The officers entered the residence with weapons drawn and announced their presence with raised voices. After discovering that there were four total occupants of the house - Defendant, Brantley, Brantley's fiancé, and Defendant's younger sister – officers cleared the rooms, determined there were no weapons or other safety risks, and holstered their weapons. At that point, some officers began searching the residence for contraband, while other officers began conducting interviews of the occupants.

Cecchini testified that he and one other officer questioned Defendant for a total of approximately forty-five minutes. All of the questioning of Defendant took place in Defendant's home. Some of the questioning took place in a "breakfast nook" area in the kitchen, while Defendant and the two officers were seated at the kitchen table. Other officers passed through this area during the questioning. Some of the questioning took place in Defendant's bedroom.

According to Cecchini, Defendant led the officers to his bedroom in order to show them incriminating CDs. While in the bedroom, the officers seized approximately a dozen CDs, and Defendant admitted to putting child pornography on the CDs.

While seated at the kitchen table, and after questioning, Defendant wrote out a confession as follows:

> about 3-4 months ago I started using to use limewire and axedentle saw child porn and started to download it. I hated myself for it and deleted it. But I download it agen and I'm sorry. And burned it to 3 cds

(*See* Mot. to Suppress, Ex. A.) The officers did not give *Miranda* warnings prior to this written statement or at any time during the questioning process. Cecchini testified that they did not do so because they did not intend to arrest Defendant at that time. It is not clear from the record whether the written statement was completed before or after the questioning that took place in the bedroom, but it is not disputed that the written statement was completed while Defendant was sitting at the kitchen table. Cecchini does not recall how much of the total questioning time was spent in the kitchen versus the bedroom, but he believes they did not spend much time in the bedroom.

During the questioning that took place in the kitchen nook and Defendant's bedroom, all other occupants of the house were seated in the living room. Brantley testified that she did not feel free to leave her seat in the living room to speak to her son. At one point, Brantley asked the officers if her son needed a lawyer, and they told her that he did not because this was just an interview. Brantley testified that her son was not mistreated by the officers and that the officers were polite to Defendant during the questioning.

Following the search, questioning, and written statement from Defendant, the officers arrested Defendant. According to Cecchini, they decided to arrest Defendant based on the number

and graphic nature of the images seized, as well as the proximity of the residence to a neighborhood school. The residence was in fact adjacent to a school, and the officers determined that an arrest was warranted under the circumstances.

**II.     Discussion**

Defendant contends that his written statement, as well as any incriminating oral statements made during the questioning, must be suppressed because they were obtained in violation of his Fifth Amendment right against self-incrimination, as articulated by the Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, Defendant contends that because he was subjected to a custodial interrogation and was not advised of his *Miranda* rights prior to the questioning, the statements he made were not voluntary within the meaning of the Fifth Amendment. *See Miranda*, 384 U.S. at 444-45.

"It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question." *United States v. Revels*, 510 F.3d 1269, 1272 (10th Cir. 2007) (quotation omitted). "Rather, as the Supreme Court held in *Miranda*, police officers must so advise individuals only when they are subject to a 'custodial interrogation.'" *Id.* at 1273. "*Miranda* thus established a two-part analysis for determining when the prescribed procedural safeguards must be provided: (1) the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation." *Id.* The focus of the hearing and this Order is the first element – whether Defendant was in custody during the questioning.[1]

---

[1] The United States does not appear to dispute that the questioning meets the legal definition of interrogation. (*See* Gov't's Resp. to Def.'s Mot. to Suppress 1, 2 (arguing that motion should be denied because "the defendant gave the statement in a non-custodial setting in his own home" and because "the meeting with the defendant did not create a coercive or a custodial situation").) In any event, the Court easily concludes that the direct questioning of

4

"A suspect is in custody for purposes of *Miranda* if the suspect has been deprived of [his] freedom of action in any significant way." *Id.* (quotation omitted). "Such a deprivation occurs when the suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Id.* (quotation omitted). The test is whether, under the totality of the circumstances, a reasonable person in the defendant's position "would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest." *Id.* at 1275. Factors to consider are "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the defendant] aware that [he] was free to refrain from answering questions, or to otherwise end the interview." *Id.* In conducting its analysis, the Court must "ignore the subjective views of the interrogating officers and focus only on what a reasonable person would have understood from the situation." *Id.* The standard is an "objective one," and a defendant's individual characteristics are relevant "only to the extent that they may have been known to the officer and influenced his conduct." *See United States v. Lamy*, __ F.3d ___, 2008 WL 852799, at *5 (10th Cir. April 1, 2008) (quotation omitted).[2] Relevant to this case, the Tenth Circuit has explained that being questioned in one's home makes it less likely that a custodial interrogation occurred. *See United States v.*

---

Defendant regarding his involvement in criminal activity and the request for Defendant to write a confession meets the legal definition of "interrogation."

[2] The Tenth Circuit has contrasted this objective standard with the subjective standard governing whether a confession violated a defendant's due process rights. *See Lamy*, 2008 WL 852799, at *5. In a due process inquiry, the ultimate question is whether the officers took unfair advantage of the defendant's traits or the surrounding circumstances, considering the age, intelligence, and education of the defendant and other relevant factors. *See id.* at *3-4. Defendant in this case has not made a due process argument, nor has Defendant argued that Defendant's disability somehow influenced the officers' conduct. Therefore, Defendant's disability has little relevance to the Court's analysis.

*Rogers*, 391 F.3d 1165, 1170 (10th Cir. 2004) (fact that interrogation took place at defendant's home weighed against a finding of custodial interrogation because it is a "neutral surrounding"). However, this fact is not dispositive. *See Revels*, 510 F.3d at 1275-76 (facts presented "belie[d] any conclusion that [the defendant's] home, on the morning of the questioning at issue, was the traditional comfortable environment that we normally would consider a neutral location for questioning").

The first factor inquires as to whether there was a police-dominated atmosphere during the questioning. In this case, the officers did not enter forcibly but were instead let into the home by Defendant, and Defendant was not handcuffed or forced to the ground at any time prior to the questioning. The majority of the questioning, including the written confession, took place at the kitchen table, which is in a common area of the home. Although some of the questioning took place in Defendant's bedroom, Defendant and the officers went to the bedroom for the purpose of allowing Defendant to show the officers the incriminating CDs. Further, there was no evidence that the bedroom door was closed or that Defendant was sequestered in the bedroom at any time. Therefore, the atmosphere created by the police does not weigh in favor of a finding of custodial interrogation. *See Lamy*, 2008 WL 852799, at *5 (finding that atmosphere was not police-dominated when interview was conducted in common area of his home, during which his mother came and went from the room); *cf. Revels*, 510 F.3d at 1275-76 (reasoning that atmosphere was police-dominated because defendant was (1) abruptly roused after officers forcibly entered their home, (2) immediately detained, (3) restrained in handcuffs, (4) placed face down on the floor, (5) separated from other members of the home, (6) escorted to a rear bedroom for questioning, and (7) questioned behind a closed bedroom door). Although the case is distinguishable from *Lamy* in that Defendant's mother

was seated in the living room and did not feel free to move about the house, the overall atmosphere in the household during the questioning was more like that presented in *Lamy* and cases cited therein than the atmosphere presented in *Revels*.

As to the nature of the questioning, there is no evidence that the officers "threatened or aggressively questioned" Defendant. *See Lamy*, 2008 WL 852799, at *6. Nor is there any evidence that the officers specifically confronted Defendant with incriminating evidence in an accusatory manner. *See Revels*, 510 F.3d at 1276 (finding that second factor indicated that the defendant was in custody because she was "confronted with the drugs in an accusatory manner" and would have "reasonably felt compelled to cooperate with the police"). Although incriminating evidence was uncovered during the search, no witness testified that officers used such evidence in a threatening, accusatory, or coercive manner while questioning Defendant. The only relevant testimony provided by Defendant's mother was that the officers were courteous and polite to Defendant while in the home. Similarly, Cecchini described the questioning as a cooperative, "nice conversation." These facts weigh against a finding of custodial interrogation. *See Rogers*, 391 F.3d at 1170-71 (fact that officers were courteous and non-threatening throughout the questioning weighed against a conclusion that defendant was in custody). As to the length of questioning, Cecchini estimated that the questioning took approximately forty-five minutes. Based on the amount and technical nature of the evidence in this case, this amount of time is reasonable and does not indicate badgering or excessive repetition of questions.

The third factor is whether the police made Defendant aware that he was free to refrain from answering questions or to otherwise end the interview. Defendant did not testify at the evidentiary hearing, so the Court does not have the benefit of his testimony regarding this fact. Cecchini

testified that Defendant was told that he was not under arrest and answered all questions willingly and cooperatively. Cecchini did not expressly testify, however, that he advised Defendant that he was free to refrain from answering questions or free to end the interview at any time. *See Revels*, 510 F.3d at 1276 (explaining that lack of police advisement that the suspect was free to refrain from answering questions is an indication of custodial interrogation); *cf. Lamy*, 2008 WL 852799, at *6 (explaining that agents "reiterated to [the defendant] that he would not be arrested that day regardless of how he answered their questions," that defendant was aware that he was free to leave or refuse to answer questions, and that third factor did not weigh in favor of finding custodial interrogation).

In addressing the third factor, the Tenth Circuit has found it significant whether or not the uncovering of incriminating evidence was completed prior to the questioning. *Revels*, 510 F.3d at 1277. In a case where significant incriminating evidence has been discovered, there is "little remaining for the officers to do inside the home other than to formally place [the defendant] under arrest" and therefore "a reasonable person in [the defendant's] position would have recognized as much." *Id.* at 1277. In contrast to *Revels*, in this case, the questioning of Defendant began while the search was being completed. Although officers had knowledge that downloaded images were sent from that residence, they did not know which household member was responsible for the images until they began the questioning. Of course, at some point during the questioning, the search had been completed, and the officers had a substantial amount of evidence incriminating Defendant.

The Court concludes that, under the totality of the circumstances, a reasonable person in Defendant's position would not have understood his freedom of action to have been restricted to a degree consistent with formal arrest. *See Revels*, 5190 F.3d at 1275. The atmosphere in the home

during the questioning was calm, cooperative, and polite. Although officers were present, the atmosphere was not one of "police domination." The majority of the questioning took place in a common room of the home, with the other family members in view of Defendant. There is no evidence that the questioning was threatening, accusatory, or coercive in any manner or that the officers used evidence uncovered during the search in their questioning of Defendant. Nor is there evidence that Defendant was sequestered or in a closed room during any of the questioning. As to whether Defendant was advised that he was free to end the interview, it appears he was not directly advised of this right. However, the other two factors (the atmosphere and nature of the questioning) do not support a finding that a reasonable person in Defendant's circumstances would have understood his freedom of action to have been restricted to a degree consistent with formal arrest. Accordingly, the Motion (Doc. 45) is DENIED.

IT IS SO ORDERED this 6th day of May, 2008.

TERENCE KERN
United States District Court